**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GARTOR KIKI BROWN, | : | |
| | : | |
| **Plaintiff,** | : | |
| v. | : | CIVIL ACTION NO. 16-2566 |
| | : | |
| RONALD PHILLIPS et al., | : | |
| | : | |
| **Defendants.** | : | |

McHUGH, J.                                                           July 9, 2021

## AMENDED MEMORANDUM

This is a section 1983 action. Plaintiff Gartor Kiki Brown, a prolific pro se litigant with numerous cases pending in the federal courts, alleges that prison officials denied him care for serious medical needs, in violation of his Eighth Amendment rights. There are extensive medical records, incident reports, and contemporaneous grievances, none of which support Mr. Brown's version of events. Having reviewed the evidence in detail, I am persuaded that this is a case involving "two different stories, one of which is blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Because Mr. Brown has failed to produce evidence sufficient to allow a reasonable jury to return a verdict in his favor, I will grant Defendant's motion for summary judgment.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was incarcerated at the George W. Hill Correctional Facility on or around January 23, 2015. Defs.' Mot. Summ J. 2, Ex. A, ECF 64; Pl.'s Mot. Summ. J., Ex. 4, ECF 63. Soon after, on February 7, 2015, Plaintiff reported trauma to his left eye. Pl.'s Mot. Summ. J. ¶¶

5-6 at 1, 3.[1]  Brown spent several weeks in the medical block following his reporting of the injury.  Pl.'s Mot. Summ. J. ¶¶ 9, 16 at 2; Defs.' Mot. Summ. J. 2.  At that time, Kristen Grady was the Health Services Administrator for the George W. Hill Correctional Facility, performing administrative duties for the medical department.  Pl.'s Mot. Summ. J., Ex. C, Defs.' Resp. to Pl.'s Interrog. 1.  Dr. Phillips was the medical director, charged with the treatment of inmates assigned to him.  Pl.'s Mot. Summ. J., Ex. C, Defs.' Resp. to Pl's Interrog. 2.  Ms. Grady and Dr. Phillips are the only remaining parties, as others were previously dismissed.  ECF 38.[2]

By way of discovery, Defendants represent that they sent Plaintiff 1,300 pages of documents on February 10, 2019 and 300 pages of documents on February 22, 2019.  ECF 60 at 1-2.  In addition, Plaintiff references a number of grievances that he filed related to this matter.  I required the Defendants in a related case to provide both the Plaintiff and the Court with all grievances filed by the Plaintiff while housed at the George W. Hill Correctional Facility, which necessarily included  grievances pertinent to this case.  *Brown v. Delaware Cty. Brd. of Prison Inspectors et al*., No. 16-2485, ECF No. 45.  Those grievances are now docketed in this case as well. ECF 71.[3]

---

[1] Plaintiff has been inconsistent in describing the date of the injury.  The initial complaint, the first amended complaint, and the second amended complaint each aver that the assault by other inmates occurred in mid-January 2015, which, if true would have been prior to his admission at the George W. Hill Correctional Facility.  Second Am. Compl. 3; Pl.'s Mot. Summ. J. 6; First Am. Compl. 2, ECF 26; Compl. 2, ECF 5.  However, since Brown now contends that the injury occurred on February 7, 2015, following his admission to George W. Hill Correctional Facility, and since the Defendants do not dispute that contention, I will proceed accordingly.  *See* Pl.'s Mot. Summ. J. ¶¶ 5-6 at 1 (describing "the February 7, 2015 incident" that occurred "in his cell" where he "sustained serious injuries to the left eye, ribbs [sic], back, and other stabb [sic] wounds around his body").

[2] To the extent that Plaintiff also seeks relief against "Nurse Alassa," I have dismissed his claims without prejudice given his failure to make service, as is required under Fed. R. Civ. P. 4(m).  ECF 68.

[3] I had initially entered summary judgment on behalf of the Defendants on March 1, 2021, but later discovered that the copy of the Grievance Log that had been sent to Mr. Brown by the Court was returned as undelivered.  ECF 72-73.  I subsequently vacated the Order and allowed the parties the opportunity to

A. Plaintiff's factual allegations

Plaintiff claims that the injury to his eye took place on February 7, 2015 and was the result of a stabbing by other inmates in his cell. Pl.'s Mot. Summ. J. ¶ 5 at 1. He reported it the same day. *Id.* He further alleges that, during the assault, he suffered bruising and contusions "on his face, around his ribs [sic], neck, back," along with various stab wounds "on the back of his wrist, right []arm . . . back, [and] right leg." *Id.* ¶ 6 at 1, 4; *see* Second Am. Compl. 3.[4]

After the incident, Plaintiff alleges that the Defendants effectively ignored his multiple injuries and denied him treatment. For example, Margaret Griffith, nurse practitioner, who saw him the day of the injury, purportedly "never evaluated or diagnosed" him, erred by classifying his eye injury as "minor," and failed to document his other injuries. Pl.'s Mot. Summ J. ¶ 8 at 2, 6. Two days later, he met with Defendant Grady and showed her the bleeding to his eye and other stab wounds, but according to Plaintiff she merely expressed that he "would have to see [Dr.] Phillips." *Id.* ¶ 10 at 2, 8. When Brown saw Dr. Phillips the following day, he described the pain in his back, ribs, and face, but Dr. Phillips "ignored [his] serious injuries." *Id.* ¶ 11 at 2. Dr. Phillips remarked that he could get pain medication from the facility's commissary— assumedly meaning that the onus was on Plaintiff to obtain pain medication with his own funds. *Id.*

---

provide supplemental briefing. ECF 80. Having considered Mr. Brown's supplemental arguments, they do not alter my conclusion that Defendants are entitled to summary judgment.

[4] Brown allegedly wrote a statement to prison officials on February 7, 2015, "asserting he was jumped and stabbed," but the statement is absent from the record. Pl.'s Mot. For Summ. J. ¶ 9 at 2.

The following week, on February 15, 2015, Plaintiff again met with Grady, making her aware "that his serious injuries had worsen[ed], and that he was not on any pain medication." P. Mot. Summ. J. 8. He informed her that "he was not getting treated by the medical department or medical officials" but was instead being "outright ignored." *Id.* The next day, February 16, 2015, he met with Dr. Phillips for the second time, but Dr. Phillips "would only glance over his shoulder and did not take the time to evaluate [him]," despite the fact that "he was still bleeding . . . from the eye and other wounds." Pl.'s Mot. Summ. J. ¶ 14 at 2. Dr. Phillips informed Brown that he "did not need medication" and that he "wanted [the Plaintiff's] eye to heal from the inside out." *Id.* According to Plaintiff, his meeting with Dr. Phillips the following week, on February 21, 2015, was very much the same. *Id.* ¶ 16.

Plaintiff claims that prior to March 3, 2015, when he was taken on an outpatient visit to meet with ophthalmologist Dr. Mielcarek regarding the injury to his eye, "he had yet to get treatment from defendants." *Id.* ¶ 19. At the appointment, Dr. Mielcarek, allegedly puzzled that he had not received treatment, expressed to Plaintiff verbally that "without surgery you may not see from that left eye." *Id.* ¶ 20. Despite what Plaintiff claims was a dire prognosis, Dr. Mielcarek prescribed eye drops, a follow up eye exam, and, according to Plaintiff, eyeglasses. *Id.* Plaintiff claims that he met with Dr. Phillips the following day and described his ongoing pain, and that Dr. Phillips confiscated the medication and told him "you can get treatment once you go home." *Id.* ¶ 21 at 2, 9. Plaintiff was then left without medication until after his release date of March 28, 2015.[5] *Id.* at 10; Pl.'s Mot. to Consult with Courts, ECF 67.

---

[5] Plaintiff does not aver a specific release date in any of his complaints. And he has made contradictory allegations regarding such date in subsequent filings. *See* Pl.'s Mot. Summ. J. 10 (asserting that Plaintiff was released in May 2015); Pl.'s Mot. Consult with Courts 1 (asserting that Plaintiff's adult rap sheet would confirm he was released around March 28, 2015). For the purposes of this motion, I will use the most recent (and specific) date that he has provided: March 28, 2015.

Plaintiff alleges that he filed a number of contemporaneous complaints about his need for medical treatment but was consistently thwarted by various officials. For example, he "wrote multiple complaint[s] on paper in grievance format, handing it over to officials but never receiv[ing] anything back." Pl.'s Resp. 5. "At no time," Plaintiff alleges, "did he "receiv[e] a reaspond [sic]." *Id.* He also states that he was informed by Warden David Burns at one point that he was not receiving proper treatment because "you write a lot of grievances and you rub the medical department the wrong way." Second Am. Compl. 3. Similarly, Grady and Dr. Phillips allegedly told him that his filing grievances motivated them to deny him any medical treatment. Second Am. Compl. 4.

Plaintiff claims that the injuries from the February 7, 2015 assault, having never been treated, ultimately resulted in his being unable to see out of his left eye. Pl.'s Mot. Summ. J. 9. He also claims to have suffered "permanent damages including but not limited to back pain" and scars. *Id.* at 4.

## II. STANDARD FOR REVIEW

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment will be granted when "the movant establishes that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *West v. Tyco Electronics Corp.*, 812 F.3d 319, 328 (3d Cir. 2016) (internal citations omitted). A dispute of fact is "'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (internal citations omitted). Moreover, "a plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his

case." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d. Cir. 1996) (citing *Celotex Corp.*, 477 U.S. at 322). As stated at the outset, the Supreme Court has made clear that if a party advances a version of events flatly contradicted by the record, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

## III. DISCUSSION

As recounted above, Plaintiff alleges that he suffered serious injuries to his eye, ribs, back, and various other parts of his body on February 7, 2015 due to an assault and stabbing by other inmates, all of which were left untreated by the Defendants.[6] Plaintiff must demonstrate that Dr. Phillips and Kristen Grady were "deliberately indifferent to . . . [his] medical needs" and "that those needs were serious" in order to prevail on his section 1983 claim. *Pearson v. Prison Health Service*, 850 F.3d 526, 534 (3d Cir. 2017) (internal citations omitted). Deliberate indifference includes "intentionally denying or delaying access to medical care or interfering with the treatment once prescribed." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). It also includes "condition[ing] provision of needed medical services on the inmate's ability or willingness to pay." *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (discussing numerous scenarios where the deliberate indifference standard is met). A serious medical need is one where a "failure to treat can be expected to lead to substantial and unnecessary suffering, and a doctor has diagnosed the condition, or the need for treatment would be obvious to a lay person." *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (citing *Colburn v. Upper Darby Twp.*, 946 F. 2d 1017, 1023 (3d Cir. 1991)).

A. <u>Plaintiff's serious medical needs were limited to the injury to his left eye.</u>

---

[6] I note that these allegations are inconsistent with the injuries listed in his initial complaint, filed in June 2016, in which he states that the lack of medical care resulted in damage to his vision and nightmares. Compl. 3.

I agree that Plaintiff had serious medical needs relating to the injury to his eye, given his diagnosis and treatment. But the record lacks any supporting evidence that Brown had additional serious medical needs, such as contusions "on his face, around his ribbs [sic], neck, back," along with various stab wounds "on the back of his wrist, right []arm . . . back, [and] right leg." *Id.* ¶ 6 at 1, 4; *see* Second Am. Compl. 3. *See Dooley*, 957 F.3d at 374 (serious medical needs are those in which a doctor has diagnosed the condition or those where the need for treatment would be obvious to a lay person); *Orsatti*, 71 F.3d at 484 ("[A] plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint"); *Pearson,* 850 F.3d at 537 (although extrinsic evidence is not necessarily required to survive a motion for summary judgment on a deliberate indifference claim, the "surrounding circumstances [must] be sufficient to permit a reasonable jury to" find in the non-movant's favor). Therefore, I will grant Defendants' motion for summary judgment with regard to Plaintiff's claims regarding injuries other than that to his eye.

The origin of Plaintiff's eye injury is in in dispute. But that dispute is not material. In analyzing the Defendants' motion, I will assume that Plaintiff's left eye was injured during an assault by other inmates on February 7, 2015.[7] Even if it that is true, Defendant's contemporaneous incident report, as well as ongoing reports in the days and weeks that

---

[7] To support this contention, Brown has provided an undated affidavit from fellow inmate, Tarence Frazier. Pl.'s Resp. to Defs.' Mot. Dismiss, ECF 34, at 22. Frazier describes a conversation he had with another inmate named "Tazz" about the fact that "Tazz" and Plaintiff had been fighting on February 7, 2015. *Id.* Most of the affidavit would be inadmissible hearsay, but regardless, it still only refers to an injury to the eye. *See id.* Meanwhile, Defendants point to a contemporaneous incident report written by staff member Isahia Cherry describing Plaintiff as having stated that he poked himself in the eye. Pl.'s Mot. Summ. J., Ex. 8. I note that Plaintiff's weekly medical assessment of February 10, 2015 states that Brown "reports being poked in the eye *before* incarceration," Defs.' Mot. Summ. J., Ex. C at 38 (emphasis added), and reiterates that each of the complaints filed in this matter state that the injury occurred in mid-January 2015. Compl. 2; First Am. Compl. 2; Second Am. Compl. 3.

immediately followed while Plaintiff was housed in the medical block, list *only* an eye injury. Despite receiving roughly 1600 pages of documents from the Defendants, Plaintiff has failed to produce any evidence that he had other serious medical needs—or indeed any other medical needs at all.  ECF 60 at 2.

Reports made by two separate staff members on February 7, 2015, the date of the alleged assault, note only the injury to Plaintiff's eye.  For example, staff member Isahia Cherry, responding to Plaintiff's request for medical attention at 6:50pm, wrote an incident report stating that Plaintiff "told me he needed to see a doctor because he poked himself in the eye. . .."  Pl.'s Mot. Summ. J., Ex. 8.  Within ten minutes, Plaintiff was evaluated by medical staff at the unit infirmary.  *Id.*, Ex. D.  Margaret Griffith, NP, conducted a full body exam at roughly 7:00pm, and did not report injuries to Plaintiff's back or ribs, nor stabbings in various other parts of his body.  *Id.*  She affirmatively reported that Plaintiff had not complained of other injuries aside from the injury to his eye.  *Id.*

Further examinations in the days that immediately followed continued to reflect that Plaintiff had no medical needs aside from the eye.  On February 8, 2015, Nurse Griffith checked Plaintiff again and noted only the issue with his eye.  Defs.' Mot. Summ. J., Ex. C, at 39-41. Then, on February 9, 2015, a report from Raequel Madara, MSW, LCSW, stated that Plaintiff "request[ed] to see an eye doctor for his eye injury" and that the patient "otherwise appeared to be compensated."  Pl.'s Mot. Summ. J., Ex. E.  On February 10, 2015, Stephanie Laflata conducted a weekly medical assessment of the eye, reporting that Plaintiff "appears in no visual distress," and that he "offered no other somatic complaints."  Defs.' Mot. Summ. J., Ex. C.  That same day, he was seen by Charles Stork, RN, during mental health segregation rounds, who

described his appearance as "neat and clean."[8]  Pl.'s Mot. Summ. J., Ex. E.  Then, on February

11, 2015, he was first seen by Dr. Phillips who described the trauma to Brown's left eye but

listed no other injury.  *Id.*, Ex. G.[9]

While Plaintiff remained in the medical block over the next two weeks, staff members

continued to evaluate him.  Yet none of their reports indicate that the Plaintiff sustained

additional injuries.  For example, Shelly Mealo, RN, who visited Plaintiff on February 13, and

Nurse Stork, who saw Plaintiff on February 14 and 15, each described his appearance as "neat

and clean" and his behavior as "appropriate."  *Id.*, Ex. I-K.  Nurse Griffith and Dr. Phillips

assessed Plaintiff separately on February 16 and each, in turn, discussed only his eye.  *Id.*, Ex. L,

M.  On February 17, 2015, Nurse Mealo conducted another medical assessment and stated that

Plaintiff had "no other somatic complaints" aside from the eye.  Defs.' Mot. Summ. J., Ex. C.

Nurses Mealo, Stork, and Dorothy Murray checked Plaintiff during mental health rounds daily

from February 18-22. Pl.'s Mot. Summ. J., Ex. O-S.  On February 24, Plaintiff was seen again by

Dr. Phillips. *Id.*, Ex. T.[10]

Plaintiff wrote numerous notes, medical requests, and grievances around this time

regarding his medical treatment; none of them contains a reference to other injuries.  For

example, Plaintiff wrote a medical request on February 22, 2015 that described ongoing

"problems with vision."  *Id.*, Ex. 5.  Similarly, Nurse Joanne McCabe reported another medical

---

[8] One assumes that if Plaintiff was bleeding from multiple stab wounds, Stork would have noted it when describing Plaintiff's appearance.

[9] Plaintiff contends that he never encountered Stork or Laflata on these occasions. Pl.'s Mot. Summ. J. 6. He also argues that he did not see Dr. Phillips that day, but in fact saw him earlier, on 2/10/15. *See* Pl.'s Mot. Summ. J. 7 ("Plaintiff did not encounter Phillips" on 2/11/15); *id.* at 4.

[10] Plaintiff claims he never encountered Mealo on February 18, 2015, nor Dr. Phillips on 2/24/15.  Pl.'s Mot. Summ. J. 7.

request by Plaintiff on February 24, 2015, noting that Plaintiff reports "seeing double/blurry vision, left eye." *Id.*, Ex. T.  And a note Plaintiff wrote to Dr. Phillips dated February 24, 2015 regarding his imminent transfer out of the medical block again mentions only the eye—"I don't feel comfortable going back to block seeing double vision and eye still being red." *Id.*, Ex. 6. Likewise, and as will be discussed further below, Plaintiff's grievances, written on March 8, 2015 and March 9, 2015, address only his eye.  ECF 71.

In sum, Mr. Brown has failed to produce any evidence supporting his allegations about the existence of serious medical needs with the exception of the injury to his eye.[11]  *See Pearson,* 850 F.3d at 537 (although extrinsic evidence is not necessarily required to survive a motion for summary judgment on a deliberate indifference claim, the "surrounding circumstances [must] be sufficient to permit a reasonable jury to" find in the non-movant's favor); *Dooley*, 957 F.3d at 374 (a serious medical need is one where a "failure to treat can be expected to lead to substantial and unnecessary suffering, and a doctor has diagnosed the condition, or the need for treatment would be obvious to a lay person.").  Because Brown has failed to produce evidence from which a reasonable juror could conclude that he had other serious medical needs, and given the trove of medical records that suggest otherwise, I will grant Defendants' motion with respect to those alleged injuries.  Defendants cannot be deliberately indifferent to medical needs that do not exist.

B.  Plaintiff has failed to set forth evidence that Defendants were deliberately indifferent to his eye injury.

---

[11] To the extent that Plaintiff has also pled that his unit in the medical block lacked heat and that he suffered frostbite, he has similarly offered no supporting evidence; moreover, his allegations are flatly contradicted by other evidence on the record. Second Am. Compl. 3; See Defs.' Mot. Summ. J., Ex. C. For example, in the February 24, 2015 note to Dr. Phillips referenced above, Plaintiff requested *to be allowed to stay* in the medical block upon being informed of his pending discharge, and made no mention of the lack of heat.  Pl.'s Mot. Summ. J., Ex. 6.  In fact, nowhere on this record does the Plaintiff take issue with the heat in his cell.  Moreover, Plaintiff's full body examinations on February 10, 2015 and February 17, 2015—conducted by different nurses—each describe Plaintiff's skin as "warm and dry." Defs.' Mot. Summ. J., Ex. C.  A February 10, 2015 medical report describes his circulation as "intact." *Id.*

Plaintiff alleges that Dr. Phillips and Health Administrator Grady were deliberately indifferent to his eye injury. Yet ultimately, he has failed to produce evidence from which a reasonable juror could so conclude. *See Lanzaro*, 834 F.2d at 346–47 (citing numerous scenarios where deliberate indifference standard is met). For the reasons set forth below, I will grant Defendants' Motion for Summary Judgment with regards to Plaintiff's claim that the treatment of his eye violated the Eighth Amendment.

    1. <u>Dr. Phillips</u>

Plaintiff's alleges that Dr. Phillips was deliberately indifferent to his medical needs in numerous ways. First, Dr. Phillips allegedly never examined Plaintiff or provided him medication.[12] Second, to whatever extent Dr. Phillips did provide care to the Plaintiff, he was not properly engaged, but instead was "lackadaisical" in his treatment.[13] Third, Dr. Phillips purportedly interfered with treatment that was prescribed by an outside eye doctor.[14] Pl.'s Mot. Summ. J. 5, 10. Finally, Dr. Phillips was ostensibly motivated by non-medical factors—specifically Plaintiff's filing of numerous grievances—in denying Plaintiff care. Second Am. Compl. 4.

Plaintiff's claims are wholly unsupported by record evidence, which shows that after Plaintiff reported the injury, he was transferred to the medical block for several weeks, where he

---

[12] Plaintiff alleges that "at no time did he get treatment" for the injury to his eye. Pl.'s Mot. Summ J., ¶ 17 at 2. Plaintiff was "deprived of medication," including pain medication, despite being in "excruciating pain." *Id.* at ¶¶ 6, 17, at 2.

[13] Plaintiff states that rather than perform an evaluation, Dr. Phillips "would only glance over . . . [Plaintiff's] shoulders." *Id.* at 6. Indeed, although Plaintiff acknowledges meeting with Dr. Phillips numerous times, he contends that "most of the encounters" involved Dr. Phillips "briefly stop[ping] and talk[ing] for 30 seconds at the time." *Id.* at 5.

[14] Dr. Phillips "confiscate[d] the medication" that Dr. Mielcarek had prescribed and ignored the eye doctor's suggestion that he receive eyeglasses." *Id.* at ¶ 21.

received consistent evaluation and treatment from numerous medical professionals, including Dr.

Phillips. Nurse Griffith attended to Plaintiff within minutes of his reporting the injury, which she

assessed as having resulted from a "foreign object" but which she described as "minor." Pl.'s

Mot. Summ. J., Ex. D. She immediately prescribed Prednisone, a corticosteroid, SMZ-TMP DS,

an antibiotic, Diphenhydramine, an antihistamine, and Ibuprofen for what she described as "left

eye conjunctivitis." *Id.* The following morning, Nurse Griffith checked Plaintiff again, found a

corneal abrasion, and added an eye ointment to the list of medications Plaintiff was already

receiving. Defs.' Mot. Summ. J., Ex. C. That same afternoon, she noted that the Plaintiff was

"ac[d]epting [sic] meds and care." *Id.* Then, on February 10, 2015, Stephanie Laflata performed

a medical evaluation, noting that Plaintiff complains of "painful left eye with associated blurred

vision," that she observed no discharge from the eye, and that she scheduled a follow up

appointment with Dr. Phillips. Defs.' Mot. Summ. J., Ex. C.

Dr. Phillips began meeting with the Plaintiff regularly the following day, February 11,

2015. *Id.*, Ex. G. He diagnosed Plaintiff with a subconjunctival hemorrhage, and prescribed a

new ointment—Gentamicin—to be applied to his eye for three days. *Id.* On February 14, 2015,

Dr. Phillips elected to continue with this same treatment for an additional three days. *Id.*, Ex. J.

On February 16, 2015, Dr. Phillips saw Plaintiff in his office, reported that there was "no pain or

drainage," and noted that he would refer Plaintiff to an outside ophthalmologist to perform an

additional slit-lamp examination. *Id.*, Ex. L. Nurse Griffith followed up with a note that

described the injury as "healing" and a prescription for Diphenhydramine and Ibuprofen for five

more days. *Id.*, Ex. M. On February 17, 2015, Nurse Mealo conducted another medical

assessment and noted that Plaintiff continued to have "blurred vision." Ex. N. A week later, on

February 24, 2015, Dr. Phillips saw Plaintiff again, stating that "Cornea, Pupil, and Iris look

good," and cleared him to leave the medical block. *Id.,* Ex. T. Plaintiff was also seen by Nurse JoAnne McCabe that day, who similarly made no reference to complaints of pain, but rather only to continued complaints of "blurred vision." *Id.*, Ex. T.

Plaintiff acknowledges having multiple meetings with Dr. Phillips,[15] but nevertheless denies that he was evaluated or treated with medication, and further denies that the pain and the bleeding ever stopped. *Id.* at 4, 6. He similarly maintains that Nurse Griffith, though meeting with him on the date of his injury, "never evaluated or diagnosed" him, nor provided him with medication. *Id.* at ¶ 8 at 2. Instead, he states that Dr. Phillips instructed him that he could "get pain meds" from the facility's commissary himself.[16] *Id.* He also denies meeting with Laflata on February 10, and that any evaluation occurred on February 17. *Id.* at ¶ 11, 6, 7.[17]

Plaintiff's allegations stand in stark contrast to the great weight of record evidence described above, which shows that Plaintiff was evaluated on an ongoing basis by three nurses and a doctor, as well as prescribed pain medication for at least two weeks following the injury.[18] Additionally, Plaintiff's allegations are conspicuously absent from two contemporaneous notes he sent on February 22, 2015 and February 24, 2015, in which he maintains that his eye is still

---

[15] He states that his encounters with Dr. Phillips were on or around 2/10/15, 2/16/15, 2/21/15, and 3/4/15. *Id.* at 4, 6.

[16] According to the facility's inmate handbook, "commissary orders are filled based on funds actually in your account at the time the order is placed." Def's Mot. Summ. J., Ex. E, at 26.

[17] Rather, he describes multiple meetings with "Nurse Alyssa," which appear nowhere on the record. *Id.* at 2.

[18] To the extent that Plaintiff additionally alleges that there were nights in which he had no mattress while staying in the medical block, and that this exacerbated his injury, he has first and foremost provided no evidence that he was forced to sleep without a mattress, nor that he ever complained of this deprivation at the time. As noted previously, his February 24, 2015 letter to Dr. Phillips requesting to stay in the medical block upon learning of his discharge certainly appears to contradict this allegation. *Id.*, Ex. 6.

red and still afflicted with blurry vision, but fails to mention any pain or bleeding, or any denial of medication or treatment. *Id.*, Ex. 6, Ex. U.

Plaintiff's contention that Dr. Phillips was deliberately indifferent to his medical needs is further contradicted by Plaintiff's visit with an outside specialist, ophthalmologist Dr. Mielcarek on March 3, 2015. Here, the record reveals not only that the Dr. Phillips timely ensured that Plaintiff was evaluated by an outside specialist (within 24 days of the reported injury), but also that Dr. Mielcarek confirmed Dr. Phillips' diagnosis and recommended a substantially similar treatment plan—more eye drops. Ex. M, V.[19] Dr. Mielcarek also recommended a follow-up eye exam, and Dr. Phillips saw Plaintiff the following day, which Plaintiff readily admits. *Id.* at 4; Defs.' Mot. Summ. J., Ex. C. And although Plaintiff asserts that Dr. Mielcarek recommended eyeglasses, unlike the eye drops, such a recommendation does not appear in the doctor's record.

After the appointment with ophthalmologist Dr. Mielcarek, the record documents show that the Plaintiff consistently refused his eye drops when multiple nurses attempted to administer them.[20] On March 5, 6, 7, 8, and 10, various officials submitted forms to this effect. Pl.'s Mot. Summ J., Ex. W. For each of three nurses—Cassidy, Whitaker, and Small—who were unable to administer Plaintiff's eye drops, there is an accompanying signature of a second party attesting

---

[19] Dr. Mielcarek is deceased. Pl.'s Mot. Summ. J., Ex. A, Defs.' Am. Answers to Pl.'s Requests for Admission, No. 28. However, his written records are capable of admission at trial as business records under Federal Rule of Evidence 803(6), and therefore can be considered on a motion for summary judgment. *See Stelwagon Mfg. Co. v. Tarmac Roofing Systems,* 63 F.3d 1267, 1275 n. 17 (3d Cir. 1992). In contrast, Dr. Mielcarek's alleged verbal statements, that Plaintiff would lose vision in his left eye unless he underwent surgery, would not be admissible, even though they relate to medical care, as they do not fit within the categories allowed by Rule 803(4)(B). It also bears mention that the alleged verbal statements are totally inconsistent with both the written records and the course of treatment recommended by Dr. Mielcarek.

[20] Plaintiff alleges that an affidavit from a fellow inmate contradicts the Defendants' story with regard to his refusal to take medication, citing to Exhibit 11, but there is no such exhibit attached to Plaintiff's motion.

as a witness.[21]  *Id.*  In sum, there is no evidence that Dr. Phillips interfered with the medication prescribed by Dr. Mielcarek.[22]

In conclusion, Plaintiff has produced no evidence corroborating his claims that Dr. Phillips "intentionally den[ied] or delay[ed] access to medical care" or that Dr. Phillips "interfer[ed] with the treatment once prescribed." *Pearson*, 850 F.3d at 534 (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).  Therefore, Plaintiff's claim that Dr. Phillips denied care because he filed grievances also fails—medical care was neither delayed nor denied. *See Pearson,* 850 F.3d at 537 (to survive motion for summary judgment, "surrounding circumstances [must] be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factor.").  Nor, for that matter, has Plaintiff produced evidence that Dr. Phillips "conditioned provision of needed medical services on the inmate's ability or willingness to pay." *Lanzaro*, 834 F.2d at 347 (internal citations omitted).  *See Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) ("When opposing a motion for summary judgment, the party bearing the burden of persuasion in the litigation is obligated 'to

---

[21] This is also corroborated by a March 9, 2015 grievance filed by Plaintiff regarding a shift commander who Plaintiff describes as having unfairly "put him in the spotlight" for not having taken his eye drops. ECF 71.

[22] Plaintiff filed a grievance on March 8, 2015 stating prescription glasses "might help" with his ongoing pain. ECF 71.  I note first that the grievance does not contain a request for pain medication but rather constitutes a request for eyeglasses.  Moreover, it was filed in the midst of Plaintiff's weeklong, clear refusal to take the medication which had already been prescribed by Dr. Mielcarek. Pl.'s Mot. Summ J., Ex. W.  And there is no record evidence that Dr. Mielcarek suggested eyeglasses, nor prescribed pain medication—indeed there is not even an allegation from Plaintiff that Dr. Mielcarek had prescribed pain medication.  *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff");  *Spruill v. Gillis*, 372 F.3d 218, 225, 236–38 (3d Cir. 2004) (inmate's complaints that pain medication prescribed was insufficient to treat debilitating pain rose to the level of a constitutional violation at motion to dismiss, but would "need to be fleshed out with further evidence").

identify those facts of record which would contradict the facts identified by the movant.'") (internal citations omitted).

Finally, to the extent that Plaintiff challenges Dr. Phillips's medical judgments or accuses him of negligence or being "lackadaisical" in his care, his claims fail as a matter of law. *See Pearson*, 850 F.3d at 538 (complaint that physician has been negligent does not state a valid claim of medical mistreatment under the Eighth Amendment) (internal citation omitted). In fact, aside from Plaintiff's allegations, there is nothing on the record from which a reasonable juror could even conclude that the treatment Plaintiff received was unsuccessful. Plaintiff states that he was released in late March 2015, yet has provided no evidence from outside medical professionals corroborating the permanent loss of vision in his left eye. *See* Pl.'s Mot. to Consult with Courts, ECF 67. Moreover, the record reveals that he was eventually re-admitted to George W. Hill Correctional Facility, but Plaintiff has neither averred nor provided any evidence to corroborate further requests for treatment that he has made. Indeed, after re-admittance, he filed 13 grievances, none of which complain of the vision lost in his left eye.[23]

All record evidence points to Dr. Phillips' active, ongoing, and effective engagement in Plaintiff's medical treatment, including with regards to pain management. Plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him."[24]

---

[23] The only mention of Plaintiff's eyes appears in a Grievance filed on May 24, 2016, more than a year later, in which he complains of experiencing "watery eyes" and "mucus buildup," as well as being in imminent danger, because of "particles of lint and dust being dispersed into [his] current cell through the ventilation system." ECF 71.

[24] Plaintiff claims that Defendants failed to provide documents in discovery or have destroyed certain evidence, including "Exhibit H," and photographs and X-rays that were taken on February 7, 2015. Pl.'s Mot. Summ J. 5, 10. He also states that he filed more grievances than are accounted for on this record. *Id.* at 5. There is no evidence anywhere in the record that X-rays were taken by the prison. It is troubling to the Court that the record includes no photographs of Brown's face/eye because it appears they were taken. *Id.*, Ex. 8, Ex. 2, Pl.'s Req. for Admission No. 3. But there is substantial evidence that Brown's injuries were conscientiously dealt with over a long period of time. The diagnosis and treatment plan of the

*Scott*, 550 U.S. at 380.  Therefore, I will grant Defendants' Motion with regard to Plaintiff's claims against Dr. Phillips.

> 2.  <u>Plaintiff has failed to produce evidence from which a reasonable juror could conclude that Kristen Grady was indifferent to his serious medical needs.</u>

Plaintiff alleges that he informed Health Administrator Grady he was not receiving pain medication on two separate occasions in February 2015, that Grady "did not have reason[] to believe that the Plaintiff was . . . undergoing treatment while he was housed in medical," and therefore that Grady was deliberately indifferent when she failed to assist him with obtaining pain medication in response to these requests.  Pl.'s Mot. Summ. J. 8.  Since I have already concluded that there were no additional injuries beyond those to his left eye, I will analyze only whether Grady was deliberately indifferent to his medical needs with regard to that injury.

As discussed at length above, Plaintiff began receiving medical treatment and was prescribed pain medication within ten minutes of reporting the injury on February 7, 2015.  The record further reflects that he was accepting medication as of February 8, 2015.  Therefore, no reasonable juror could conclude that Grady had reason to believe Plaintiff was being mistreated if, in fact, he informed her he was not receiving pain medication the following day.  If Grady had inquired in response to such a complaint, either by speaking with Nurse Griffith or reading her report, the contemporaneous evidence at the time would have been that Plaintiff was indeed receiving medication.[25]  Moreover, there are no complaints or grievances filed by Plaintiff indicating that he complained of being denied pain medication in February 2015.  ECF 71.

---

outside specialist consulted, Dr. Mielcarek, are consistent with those of Dr. Phillips.  *Id.*  Given all the other evidence available, the lack of photographs does not weigh against the conclusion I reach here.

[25] The same is true for Plaintiff's claim that Grady was deliberately indifferent when Plaintiff made a similar complaint to her on February 15, 2015, four days after he began seeing Dr. Phillips. P. Mot. Summ. J. 8.

Therefore, his claim against Grady fails as a matter of law. *See Pearson*, 850 F.3d at 540 (a non-medical prison official is not chargeable with deliberate indifference, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.") (internal citations omitted). I will therefore grant Defendants' motion with regard to Plaintiff's claims against Defendant Grady.

C. Plaintiff's Sworn Statements

As discussed above, there is a lack of any corroborating evidence for Mr. Brown's claim that he had serious medical needs aside from the injury to his eye, as well as his claim that the Defendants were deliberately indifferent to that injury. This case, like others I have adjudicated involving the same Plaintiff, therefore raises the difficult question of whether Plaintiff's testimony by itself creates a genuine issue of fact. *See, e.g., Brown v. Phillips*, No. CV 16-3887, 2020 WL 6158230, at \*3 (E.D. Pa. Oct. 21, 2020). A plaintiff's sworn statement, standing alone, can certainly be sufficient to survive a motion for summary judgment. *See Jackson v. University of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987); *Pearson,* 850 F.3d at 537 (extrinsic evidence is not necessarily required to survive a motion for summary judgment on a deliberate indifference claim, so long as "surrounding circumstances . . . [are] sufficient to permit a reasonable jury to" find in the non-movant's favor). In narrow circumstances, however, sworn testimony may not suffice to establish a genuine issue of material fact, particularly where the nonmoving party essentially "reassert[s] factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). As the Third Circuit recognized

in *Williams,* the Supreme Court's trilogy of cases on summary judgment[26] requires district courts to make "difficult, fact-specific" judgments. *Id.* at 460–61.

I confronted this same problem in another case brought by Mr. Brown, *Brown v. Phillips*, No. CV 16-3887, 2020 WL 6158230, at *3 (E.D. Pa. Oct. 21, 2020). After analyzing relevant case law, I concluded that in some circumstances even sworn testimony or affidavits might not suffice to provide enough evidence to enable a jury to reasonably find for the non-moving party on the issue. *Id.*; *see Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986). This is another case where I am also persuaded that Plaintiff's testimony does not create a genuine dispute of fact, especially given the presence of contrary and abundant medical evidence, including the report of an outside doctor. *Cf. Bushman v. Halm*, 798 F.2d 651, 661 (3d Cir. 1986) ("[I]n the absence of any *contrary* medical evidence, plaintiff's sworn testimony must be taken as true for purposes of creating a fact issue.") (emphasis added).

The penalty of perjury has attached to Plaintiff's sworn testimony and it must therefore be accorded substantial weight. However, at this stage of the litigation, Plaintiff has received roughly 1,600 pages of records through discovery and yet can only reiterate the allegations from his pleadings, which are entirely contradicted by records completed at the time. *See Williams*, 891 F.2d at 460. For Plaintiff to be correct, at a minimum, ***fourteen*** different prison employees would need to have falsified contemporaneous reports.[27] *See Brown*, 2020 WL

---

[26] *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Co.,* 475 U.S. 574 (1986).

[27] I say "at a minimum" because to the extent that Mr. Brown suffered serious injuries one presumes he would have continued to raise them after March 9, 2015, given that he was not released until the end of March. *See* Pl.'s Mot. to Consult with Courts, ECF 67. One also presumes he would be able to point to unfulfilled requests to be seen by medical providers after being re-admitted to the George W. Hill Correctional Facility in 2016.

6158230, at *4 (granting Dr. Phillips' motion for Summary Judgment against the same Plaintiff under similar circumstances); *Orsatti*, 71 F.3d at 484; *Pearson,* 850 F.3d at 537.  In short, Plaintiff's version of events is highly improbable, and although there are multiple ways it might have been corroborated by the record, there is no supporting evidence.[28]  Given that, a reasonable jury could not conclude that the Plaintiff is the subject of the conspiracy and coverup that he alleges.

In that regard, I return to the fact that Plaintiff is a highly experienced *pro se* litigant, with multiple cases before this Court.  In *Brown v. Upper Darby Police Dept.,* No. 16-2255, 2020 WL 733108 (E.D. Pa. Feb. 13, 2020), Plaintiff alleged that he was brutally beaten while police were trying to secure a DNA sample after arrest, an incident that he alleged was captured on videotape.  The incident was indeed recorded but revealed no assault.  At summary judgment, Brown then alleged for the first time that a separate beating ostensibly occurred in another room without recording capability.  I refused to entertain his new and contradictory theory of liability for a variety of reasons, including the Third Circuit's decision in *Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703, 705-06 (3d Cir. 1988), which cautioned district courts not to place weight upon transparent attempts to defeat summary judgment.  The issue here is different, but the only injury reasonably supported by the record, Mr. Brown's eye, was treated.  Plaintiff cannot prove other injuries that rise to the level of a "serious medical condition."  An outside specialist was timely consulted with respect to the eye, and his diagnosis and treatment did not differ from prison doctors in any meaningful way.  Consequently, Plaintiff's claims under Section 1983 fail as a matter of law.

---

[28] In supplemental briefing, Mr. Brown attempts to explain this total lack of evidence by alleging a conspiracy among prison officials.  Pl.'s Supp. Memo. 5, ECF 81.  As noted above, this would require a conspiracy of extraordinary breadth, and he has failed to produce any facts that would support such a finding.

D. <u>Administrative Exhaustion</u>

Defendants argue in the alternative that Plaintiff has failed to exhaust administrative remedies under the Prison Litigation Reform Act (PLRA).[29] The "PLRA's exhaustion requirement . . . requires inmates to exhaust 'available' administrative remedies before challenging prison conditions in federal court." *Hardy v. Shaikh*, 959 F.3d 578, 583–84 (3d Cir. 2020) (citing 42 U.S.C. § 1997e(a)). Where, as here, the prison's grievance procedure is provided to the prisoner in writing, the prison is obligated to follow such a procedure. If a prisoner does not properly exhaust his available administrative remedies, he procedurally defaults his claim. *See Spruill*, 372 F.3d at 230; Defs.' Mot. Summ. J., Ex. D.

The record reflects that Plaintiff failed to comply with the prison's two-step grievance process, having failed to appeal either of the two grievances he filed in March 2015. ECF 71. But Plaintiff claims that the option to file an appeal was unavailable to him. Pl.'s Resp. 5. I need not resolve this question, having already concluded that the Plaintiffs' claims fail on the merits.[30]

## IV.    CONCLUSION

Because Plaintiff cannot show that the Defendants were deliberately indifferent to his serious medical needs, Defendants' Motion for Summary Judgment will be granted. Plaintiff's Motion for Summary Judgment will be denied. An appropriate Order follows.

   /s/ Gerald Austin McHugh    
United States District Judge

---

[29] "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

[30] The Third Circuit has recently outlined the procedures required so that a court may resolve such threshold factual disputes without the participation of a jury. *See Paladino v. Newsome*, 885 F.3d 203, 211 (3d Cir. 2018) (internal citations omitted).